UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                              |
MICHAEL SENNO,                                |
                                              |
                    Plaintiff,                |
                                              |        08 Civ. 2156 (KMW)
        -against-                             |
                                              |        OPINION and ORDER
                                              |
ELMSFORD UNION FREE SCHOOL DISTRICT, |
CAROL FRANKS-RANDALL, individually,           |
BETTY FUNNY-CROSBY, individually,             |
MATTHEW R. C. EVANS, individually, and        |
DEBRA B. LAWRENCE, individually,              |
                                              |
                    Defendants.               |
                                              |
-------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

Plaintiff Michael Senno ("Plaintiff") brings this action pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, against Defendants Elmsford Union Free School District (the "District"); Carol Franks-Randall, individually ("Dr. Franks-Randall"); Betty Funny-Crosby, individually ("Ms. Funny-Crosby"), Matthew R. C. Evans, individually ("Mr. Evans"); and Debra B. Lawrence, individually ("Ms. Lawrence") (collectively, the "Defendants").  Plaintiff alleges that Defendants collectively violated his rights under Title VII by engaging in gender discrimination, and retaliation for Plaintiff's filing of a complaint with the Equal Employment Opportunity Commission ("EEOC").

Defendants move, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), for summary judgment dismissing the complaint.  For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part, as to the District; and GRANTED as to the individual Defendants.

1

# I.     BACKGROUND

## A.     Factual Background

### 1. Parties

Unless otherwise noted, the following facts are undisputed and are derived from the parties' Local Civil Rule 56.1 statements, affidavits, and other submissions.  The Court construes all evidence in the light most favorable to the non-moving party and draws all inferences in the non-moving party's favor.[1]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 255 (1986).

Plaintiff is the former Deputy Superintendant for the District (Defendants' Local Civil Rule 56.1 Stmt. (hereinafter "Defs.' 56.1 Stmt.") ¶ 19.)  He was appointed to that role in 2005, having previously served as an Assistant Superintendant for Business Affairs for the District since 1993.  (*Id.* ¶¶ 1, 17.)  He received tenure in approximately 1994. (*Id.* ¶ 2.)  He was also the District Clerk until January 2008, and was appointed a sexual harassment officer for the District in 2005.  (*Id.* ¶¶ 14, 15.)  He occupied the role of Deputy Superintendent until disciplinary charges were issued against him in February 2008, at which time he was suspended with pay during the pendency of hearings pursuant to New York State Education Law § 3020-a ("Section

---

[1] In a number of their Local Rule 56.1 Statement Responses, both parties neither admitted nor denied a particular statement, but admitted that a particular statement was reflected in the other party's testimony.  For example, Plaintiff states that he graduated with a degree in accounting from Marist College.  (Plaintiff's Local Civil Rule 56.1 Statement (hereinafter "Pl.'s 56.1 Stmt.") ¶ 335).  Defendants' response is "Admit that that was plaintiff's testimony."  (*Id.*)  Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact.  *See AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De-Mar Food Services Inc.*, No. 06 Civ. 2142, 2007 WL 4302514, *4-5 (S.D.N.Y. Dec. 7, 2007) (citing Fed. R. Civ. P. 56(e); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763, 2006 WL 2136249, at *4 (S.D.N.Y. Aug. 1, 2006) ("To the extent the [responding party] proclaim[s] factual assertions to be in dispute without identifying evidence in the record, [that party] thwart[s] the basic purpose of [Local Rule 56.1].");  *id.* (holding that a tactic where the responding party "dispute[s] the factual assertions . . . with objections alone" and fails to cite evidence "directly violates" Rule 56.1.)).

3020-a" or "3020-a").  (*Id.* ¶¶ 231-32, 238.)  Following the hearings, at the recommendation of

the Hearing Officer, in December 2009, Plaintiff's job was terminated by vote of the District

Board of Education (the "Board").

Defendant Franks-Randall was, at all times relevant to this case, the Superintendent of

the District, until her retirement in June 2008. (*Id.* ¶¶ 3, 9; Stern Declaration in Support of Defs.'

Motion for Summary Judgment ("Stern Dec.") Exs. A and B, Complaint and Amended Answer.)

Defendants Funny-Crosby, Evans and Lawrence were, at all times relevant to this case,

members of the Board.  (Stern Dec. Exs. A and B.)

### 2.  Sequence of Events

The events relevant to this case began with a consensual sexual affair between Plaintiff

and another administrator in the district, Dr. Sandra Calvi-Muscente ("Dr. Calvi").  During the

affair, which lasted roughly from September 2005 through June 2007 (Defs. 56.1 Stmt. ¶¶ 61,

77), Dr. Calvi was the Assistant Principal of the District's Junior / Senior High School.  (*Id.* ¶

20.)  At that time, she was also a member of the Board of Education of the Mahopac Central

School District.  (Pl.'s 56.1 Stmt. ¶ 457.)  She was also a District sexual harassment officer.  (*Id.*

¶ 345.)

The parties vigorously dispute how to characterize where Plaintiff and Dr. Calvi sat in the

District hierarchy *vis a vis* one another.  Plaintiff insists that he was not Dr. Calvi's direct

supervisor and that they were not in the same chain of command.  (*Id.* ¶¶ 346-351.)  Defendants

state that, as Deputy Superintendent, Plaintiff was the second highest ranked official in the

District, that he had the authority to direct Dr. Calvi to do things, that she brought certain

disciplinary matters to his attention, and that he approved a percentage in the District budget for

Dr. Calvi's raises.  (Defs. 56.1 Stmt. ¶¶ 26-40.)  Although the Court is not able to resolve all of

these factual disputes on this record, it is undisputed that Plaintiff was ranked higher in the District hierarchy than Dr. Calvi, and that, although his job involved the business, rather than instructional, aspects of District operations, he was also occasionally involved with supervision (and discipline) of instructional staff.  (*Id.* ¶¶ 42-50.)

The affair between Plaintiff and Dr. Calvi was kept secret until June 2007.  (*Id.* ¶ 110.) In fact, on two separate occasions – once in January 2006, and once in early June 2007 – Dr. Franks-Randall asked Plaintiff directly if he was having an affair with Dr. Calvi, and both times he denied it.  (*Id.* ¶¶ 65-66, 103.)  On June 4, 2007, Dr. Calvi informed Plaintiff's wife of the affair.  (*Id.* ¶ 110.)  On June 18, 2007, Plaintiff admitted to Dr. Franks-Randall that he had been having an affair with Dr. Calvi.  (*Id.* ¶ 111.)  He also described his efforts to end the relationship, as well as the alleged threats and harassment against him by Dr. Calvi during the dissolution of the relationship.  (Pl.'s 56.1 Stmt. ¶¶ 380-82.)  At a meeting held that week between Plaintiff, Dr. Franks-Randall, and an attorney for the District, the attorney stated that Dr. Calvi had the "trump card" because Plaintiff was her superior, and that Dr. Calvi could therefore sue the District and/or Plaintiff personally in connection with the affair.  (Defs. 56.1 Stmt. ¶ 127; Pl.'s 56.1 Stmt. ¶¶ 389-90.)

Later in June 2007, Plaintiff apologized to the Board and to Dr. Franks-Randall for engaging in the affair.  (Defs. 56.1 Stmt. ¶ 132.)  Initially, Dr. Franks-Randall and the Board expressed support for Plaintiff and told him that they would forgive him for the affair.  (*Id.* ¶ 133.)  Dr. Franks-Randall and members of the Board told Plaintiff that "everything was going to be ok" and "it was all going to go away."  (Pl.'s 56.1 Stmt. ¶¶ 393.)  Plaintiff received a 6% salary raise at the end of June 2007.  (Defs. 56.1 Stmt. ¶¶ 134.)

4

On August 14, 2007, Dr. Calvi approached Dr. Franks-Randall and attorneys for the

District to discuss Plaintiff's handling of an earlier sexual harassment complaint Dr. Calvi had

made against another District employee, David Leis.  In the course of that meeting, Dr. Calvi

also raised a series of other allegations of misconduct by Plaintiff, including, *inter alia*, that it

was Plaintiff who harassed her and made inappropriate comments to her during their

relationship; that Plaintiff shared certain confidential information with her; and that he had asked

her to perform a reading evaluation of his daughter.  (*Id.* ¶¶ 135-60.)  On August 20, 2007, Dr.

Franks-Randall and counsel for the district met with Plaintiff to question him about these new

allegations, but Plaintiff declined to answer questions and stated that he wanted to retain an

attorney.  (*Id.* ¶¶ 164-67.)  The next day, Plaintiff, through his attorney, filed a complaint with

the Equal Employment Opportunity Commission ("EEOC") alleging "reverse sexual

harassment" by Dr. Calvi, and alleging that the District "has been made aware of [Dr. Calvi's]

predatory sexual behavior . . . and has failed to take remedial, much less prompt remedial

action." [2]  (Stern Dec. Ex. U, EEOC Charge, Filed August 21, 2007.)  That same day, Plaintiff's

---

[2] The EEOC Charge reads, in full:

> I am a male employee of the Respondent School district, having been
> continuously employed there for in excess of fourteen years.  My present job
> position is Deptuy Superintendent.  Over the course of the past several months I
> have been targeted for reverse sexual harassment by one of the District
> Administrators, Assistant (High School) Principal Sandra Calvi Muscente.  She
> has, through threats, sought to force me to maintain an unwanted sexual
> relationship with her - - advising, in the presence of at least one District staff
> member, that if I do not she would either destroy my marriage or cost me my
> employment with the District.  In that connection she has repeatedly harassed me
> in the workplace, screaming about our 'sexual relationship' in the presence of
> staff and within ear shot of students under circumstances intended to degrade
> and/or coerce me.  She has, also in that connection, attempted to imprison me in
> my office, and badgered me in the High School gymnasium with obscenity laced
> attacks.  The District Administration has been made aware of her predatory sexual
> behavior as directed at me and has failed to take remedial, much less prompt

counsel faxed a letter to Dr. Franks-Randall advising her that the EEOC complaint had been filed and stating "that it is a violation of federal law to take adverse employment action against anyone by reason of such a filing.  Under these circumstances I suggest that no retaliation occur.  For if it does, we will immediately file a federal civil rights action . . . ." (Stern Dec. Ex. V.) Thereafter, Plaintiff refused to answer further questions from Dr. Franks-Randall or counsel for the District in connection with the affair or Dr. Calvi's allegations.  (Defs 56.1 Stmt. ¶ 173.)

Dr. Franks-Randall brought Dr. Calvi's allegations to the Board, and recommended that the Board authorize an independent investigation into the allegations.  (*Id.* ¶¶ 178-80.)  The Board authorized the investigation, and, in September 2007, retained the law firm of Jackson Lewis LLP to conduct the investigation.  (*Id.* ¶¶ 180, 182.)  Michelle Phillips, Esq., of that firm, performed the investigation, during the course of which she interviewed nine witnesses, including Dr. Calvi, and reviewed documents and personnel files.  (*Id.* ¶¶ 184-85.)  Plaintiff refused to participate in the investigation.  (*Id.* ¶¶ 202-05.)

Ms. Phillips presented the results of the investigation to the Board in October 2007. Based on the information provided by Dr. Calvi and others, Ms. Phillips determined that Plaintiff had engaged in certain improper conduct and recommended that the District proceed with dismissal charges pursuant to Section 3020-a.[3]  (*Id.* ¶¶ 214-29.)

---

remedial action.  Under the premises I charge the District with violating my rights as guaranteed by Title VII, 42 U.S.C. § 2000e *et seq.*

(Stern Dec. Ex. U.)

[3] Defendants contend that prior to the issuance of any disciplinary charges, Plaintiff was given the opportunity to resign his position with a payout, rather than face disciplinary charges. Plaintiff denies this, and states that the opportunity to negotiate was not extended until after disciplinary charges were preferred.  (Defs. 56.1 Stmt. ¶ 325.)  Defendants state that Plaintiff declined the offer, which Plaintiff denies.  (*Id.* ¶ 326.)

On February 6, 2008, the Board found probable cause to file disciplinary charges against Plaintiff for (1) misconduct, (2) conduct unbecoming an administrator and (3) insubordination. (*Id.* ¶¶ 231, 234.)  The misconduct charge was supported by fifteen specifications of acts of misconduct; the conduct unbecoming charge was supported by five specifications (all of which were also included as specifications under the misconduct charge); and the insubordination charge was supported by three specifications (all of which were also included as specifications under the misconduct charge).  (Stern Dec. Ex. Z, Disciplinary Charges, Issued Feb. 6, 2008.) Ten days of hearings were held between August 5, 2008 and April 21, 2009 before a Hearing Officer.  (Defs. 56.1 Stmt. ¶ 238.)  Both parties were represented by counsel, submitted briefs, submitted evidence, and called witnesses.  (*Id.* ¶¶ 239-244.)  Plaintiff chose not to testify on his own behalf.  (*Id.* ¶ 245.)

On November 8, 2009, the Hearing Officer issued a decision, finding that four of the fifteen specifications for the misconduct charge were substantial charges, and were substantiated by the evidence, while the other eleven were not substantial and/or not substantiated.  (*See* Stern Dec. Ex. BB, Opinion and Award of Joel M. Douglas, Ph.D, Hearing Officer, *In the Matter of Disciplinary Proceedings Between the Elmsford Union Free School District and Michael Senno, Respondent*, SED File No: #10, 231 (hereinafter the "Decision") at 28.)  He also dismissed the conduct unbecoming and insubordination charges as duplicative of the misconduct charge. (Decision ¶¶ 51-52.)  Based on the charges that were substantiated, the Hearing Officer recommended that Plaintiff's employment be terminated.  (Defs. 56.1 Stmt. ¶ 281.)  On

December 2, 2009, the Board accepted that recommendation and terminated Plaintiff.[4] (*Id.* ¶ 282.)

Dr. Calvi was never the subject of disciplinary charges under Section 3020-a in connection with the events surrounding her affair with Plaintiff. (Pl.'s 56.1 Stmt. ¶ 541.) In the summer of 2008, she voluntarily resigned her tenured position as Assistant Principal, and was immediately rehired as the Director of Research and Development for the District under a three-year contract with the same salary and benefits as her previous job.[5] (*Id.* ¶¶ 543, 546.) In connection with her new employment contract, she withdrew an EEOC complaint that she had filed at some point in April or May of 2008.[6] (Bellantoni Declaration in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Bellantoni Dec.") Ex. 2, Transcript of 3020-a Hearing, Dec. 16, 2008, at 56-57; Decision ¶ 57.)

### 3. Allegations of Misconduct

Plaintiff's claim is premised upon an allegation that he and Dr. Calvi were subject to disparate treatment based on gender discrimination and retaliation by the District for Plaintiff's filing of an EEOC complaint. This claim will turn on whether Plaintiff and Dr. Calvi were

---

[4] Plaintiff appealed the Decision in New York State Supreme Court, Westchester County. (Defs. 56.1 Stmt. ¶ 285.) The Decision was affirmed on February 1, 2010. (*Id.* ¶ 286.)

[5] The parties dispute the degree to which her decision to resign her job as Assistant Principal was voluntary. Defendants state that she was "asked to resign her tenured position as Assistant Principal," (Defs. 56.1 Stmt. ¶ 321), and that the Superintendent at that time determined that it was the best course of action to reassign Dr. Calvi to a new position. (Defendants' Response to Pl.'s 56.1 Stmt. (hereinafter "Defs. 56.1 Resp.") ¶ 542.) Plaintiff states that she did not lose her position as Assistant Principal, but rather, according to her own testimony, she voluntarily gave up the position to take on the new job. (Pl.'s 56.1 Stmt. ¶¶ 542-46.) Defendants concede that it was Dr. Calvi's decision to resign her position. (Defs. 56.1 Resp. ¶ 543.)

[6] The record is a bit ambiguous on the timing with respect to this issue. The Hearing Officer's Decision states that the negotiation for Dr. Calvi's new job took place in June 2007 (Decision ¶ 57), but the Court believes that this is a typographical error. All of the other evidence in the record on this issue shows that the EEOC complaint was filed in Spring 2008, and that the negotiations regarding Dr. Calvi's resignation and rehiring took place in Summer 2008.

similarly situated "in all material respects," which, in turn, depends in part upon whether they

engaged in misconduct that was "of comparable seriousness." *Graham v. Long Island R.R.*, 230

F.3d 34, 39, 40 (2d Cir. 2000). Thus, the Court first reviews the alleged misconduct with which

the District charged Plaintiff, and then reviews the alleged misconduct of Dr. Calvi.

### a. Conduct For Which Plaintiff Was Found Culpable by the Hearing Officer

Plaintiff was found to have engaged in four acts of misconduct, which supported the

Hearing Officer's recommendation of termination: (1) taking a "sick day" when in fact he was

not incapacitated from work due to illness; (2) requesting that Dr. Calvi do a reading evaluation

for his daughter, who was not a student in the District; (3) having sexual relations with Dr. Calvi

in the school building; and (4) disclosing to Dr. Calvi confidential information obtained in an

Executive Session of the Board, relating to negotiations with the District's Administrator's

Union, of which Dr. Calvi was a member.

As to the first two charges, the Hearing Officer found that they were substantiated by the

record, but were of minimal importance, and would not alone have supported Plaintiff's

termination. (Decision ¶¶ 11, 50, 53.) The reading evaluation did not occur on school property

or during school time, and Defendants acknowledge that there is no policy or rule in place

prohibiting such an evaluation. (Pl.'s 56.1 Stmt. ¶ 403.) The Hearing Officer concluded that

"[t]he only objection to the entire event appeared [to be] that the Superintendent believed it to be

wrong." (Decision ¶ 41.)

Regarding the sick day, the Hearing Officer concluded that the charge was proven, but

that there was "no support in the record that employees who take an unauthorized or unwarranted

sick day should be terminated," and that there was no absence policy which requires a doctor's

note or permission slip for missing a day of school. (Decision ¶ 39.)

At the same time, the Hearing Officer found that even in engaging in this more minor misconduct, Plaintiff "continuously displayed poor judgment" (Decision ¶ 41), and that these charges must be viewed in light of the "cumulative misconduct proven against him." (Decision ¶ 53.)

The Hearing Officer considered the other charges more serious, describing the accusation of sexual activities on school property as being "of great concern" (Decision ¶ 29), and concluding that Plaintiff's engaging in such conduct "destroyed his ability to operate effectively as Deputy Superintendent" and "violated the role model obligations expected of him."[7] (Decision ¶ 60.)

The Hearing Officer concluded that by far the "most serious" charge was that Plaintiff revealed confidential Board information to Dr. Calvi during union negotiations. (Decision ¶ 40.) Plaintiff now denies this charge completely (Stern Dec. Ex. C, Transcript of Deposition of Michael Senno, at 201-09), but did not deny it at any point during the District's investigation or the 3020-a hearings. (Defs. 56.1 Stmt. ¶¶ 256-57.) Dr. Calvi stated that Plaintiff had disclosed confidential information from executive sessions regarding union negotiations, and had told her "what to ask for" during contract negotiations, including that she should seek a stipend because she had obtained her doctorate. (*Id*. ¶¶ 158-60.) Dr. Calvi also provided a copy of a contract proposal from the Administrator's Union with handwritten markups that appear to suggest what

---

[7] The Hearing Officer noted that a finding that Plaintiff engaged in sexual relations with Dr. Calvi on school property meant that Dr. Calvi had also engaged in the same conduct, yet was not the subject of any Section 3020-a charges. (Decision ¶¶ 29-30, 53.) In fact, the record shows that, during the investigation, Dr. Calvi stated that she had additional information about Plaintiff's misconduct but would reveal that information only in exchange for immunity from discipline with respect to that particular conduct. (Defs. 56.1 Stmt. ¶¶ 192-197.) The District agreed to these terms, and Dr. Calvi revealed that she and Plaintiff had engaged in sexual relations in the school building. (*Id*.) Thus, Dr. Calvi was not subject to any discipline in connection with that incident.

the union should seek in their negotiations.  (*Id.* ¶¶ 189.)  Witnesses familiar with Plaintiff's

handwriting, including Dr. Franks-Randall and Ms. Lawrence, testified to their belief that

Plaintiff had written the markups on the document.  (*Id.* ¶¶ 157, 191, 219.)

The Hearing Officer found this charge substantiated, and noted that "[t]his type of

behavior where management is telling labor what kind of proposal they should be making was

viewed by the District as egregious and can independently serve as just cause for one's

dismissal."  (Decision ¶ 20.)  The Hearing Officer also noted that "this type of misconduct goes

to the very heart of the collective bargaining process."  (Decision ¶ 23.)  The Hearing Officer

concluded that

> [t]his clearly is a breach of trust and illustrative of remarkably poor judgment
> displayed by [Plaintiff].  [Plaintiff] was entrusted with confidential information
> and to use that knowledge in support of his lady friend in order to enable her to
> gain additional compensation also reflects a lack of loyalty.  [Plaintiff's]
> dedication must be with the District and not to a woman who [he] is, or was
> having a personal relationship with.  To put the "affair" ahead of his trusted
> position is indicative of an individual who has lost virtually any semblance of
> knowing what is correct behavior and what is not.

(Decision ¶ 40.)

The Hearing Officer concluded, based upon the misconduct for which Plaintiff was found

culpable that Plaintiff "has lost his ability to effectively function as a representative of the

Elmsford School District.  His lack of sound judgment in engaging in the proven misconduct has

rendered him a liability to the District."  (Decision ¶ 60.)

### b.  Conduct For Which Plaintiff Was Not Found Culpable

Plaintiff was also charged with the following specifications under the misconduct charge:

(5) harassing Dr. Calvi through repeated phone calls, inappropriate comments, gifts, and by

ignoring job-related requests for assistance; (6) treating Dr. Calvi differently by refusing to meet

with her alone regarding District business; (7) and (8) lying to Dr. Franks-Randall about the

nature of his relationship with Dr. Calvi on two separate occasions during the affair; (9) failing to recuse himself from meetings with Dr. Franks-Randall and Dr. Calvi regarding personal issues related to Dr. Calvi while the affair was ongoing; (10) making inappropriate comments to Dr. Calvi, including referring to her as a "whore," asking who she was sleeping with, and asking if she had "spread her legs for another man"; and (11) referring to Dr. Franks-Randall, who is African-American, with a racial epithet in a private conversation with Dr. Calvi.  Plaintiff was also charged with a variety of misconduct connected to his handling of Dr. Calvi's complaints of sexual harassment by another District employee, David Leis, during the last months of the affair. Specifically, Plaintiff was charged with (12) failing to report and process a sexual harassment complaint regarding Mr. Leis as reported to him by Dr. Calvi on March 12, 2007; (13) failing to recuse himself from the investigation and determination of the complaint on June 12, 2007, notwithstanding the conflict of interest which had resulted from the dissolution of his personal relationship with Dr. Calvi; and (14) failing to properly investigate and process the complaint again on June 12, 2007.  Finally, Plaintiff was charged with (15) filing an inaccurate report of an altercation between Plaintiff and Dr. Calvi that took place in the hallway of the school on June 15, 2007 (the "June 15 Hallway Incident").  Specifically, Plaintiff did not report that Dr. Calvi had used profanity during the argument (stemming from Plaintiff's alleged failure to investigate the Leis complaint to her satisfaction), which was overheard by students and other District employees.  (Stern Dec. Ex. Z.)

For each of these charges, the Hearing Officer found that there was insufficient evidence to find Plaintiff culpable, and/or that the acts complained of were *de minimis* and inappropriate for discipline under 3020-a.

### c.  Dr. Calvi's Alleged Misconduct

Plaintiff makes a broad variety of allegations against Dr. Calvi, but the only conduct that is relevant for comparing the District's disciplinary action against her (or lack thereof) is conduct that was known to the District.  Accordingly, the Court considers only that alleged conduct.

1) *Dr. Calvi lied repeatedly to Dr. Franks-Randall*.

Defendants concede that Dr. Franks-Randall believed that Dr. Calvi lied to her "repeatedly."  (Pl.'s 56.1 Stmt. ¶ 414.)  Defendants also concede that the Board was informed that Dr. Calvi lied to Dr. Franks-Randall on several occasions.  (*Id.* ¶ 502.)

2) *Dr. Calvi harassed and threatened Plaintiff during the affair*.

Plaintiff alleges that, notwithstanding the charge that he harassed Dr. Calvi, it was Dr. Calvi who harassed him over the course of their relationship, including threatening his career, his family, and threatening to physically harm herself.  Plaintiff states that he attempted to end the relationship in October 2006, but because of these alleged threats, he felt "blackmailed" into continuing the relationship through June 2007.  However, much of this conduct was not brought to the attention of Defendants, and so could not have been the basis of any disciplinary action against Dr. Calvi.  For example, Plaintiff claims that in March 2007, when he suggested that she stay in a relationship with a different man instead of Plaintiff, Dr. Calvi became angry and threw a District-owned cell phone at Plaintiff's head, shattering it against a car window.  (*Id.* ¶¶ 370, 373.)  However, it is not clear when (if at all) this incident was brought to the attention of Defendants.

Defendants were indisputably aware that Dr. Calvi had engaged in some of the same behavior with which Plaintiff was charged, particularly making repeated phone calls to Plaintiff in an alleged effort to keep the relationship going.  Dr. Franks-Randall stated that this conduct

was "inappropriate."[8]  (*Id.* ¶¶ 512-13.)  Defendants were also made aware that on one particular

occasion, within earshot of another District employee, Dr. Calvi threatened Plaintiff, saying,

"Your wife or your job . . ." (*Id.* ¶¶ 369, 519.)

At the meeting when Plaintiff confessed to the affair to Dr. Franks-Randall, he informed

her of Dr. Calvi's threats, although it is not clear precisely what he told her at that time.  (*Id.* ¶

382.)  During that conversation, Dr. Franks-Randall referred to Dr. Calvi's behavior as similar to

the antagonist in the Paramount Pictures film, *Fatal Attraction*, wherein a scorned woman was

"distressed, angry . . . calling after [the man]."  (*Id.* ¶ 380.)

3)  *Dr. Calvi engaged in misconduct during the June 15 Hallway Incident.*

Plaintiff suggests that Dr. Calvi should have been subject to more extensive disciplinary

action in connection with the June 15 Hallway Incident.

Plaintiff cites to a memorandum written by two District employees who witnessed the

incident, and to a letter from another District employee who also witnessed the incident.  The

memorandum, written at Dr. Franks-Randall's request, states that the staff members heard Dr.

Calvi shouting at Plaintiff, using profanities and expletives, and that several students heard the

argument and asked about the disturbance (*Id.* ¶¶ 422-27; Bellantoni Dec. Ex. 6.)  The letter, sent

to Dr. Franks-Randall and each member of the Board, describes the incident in similar terms.[9]

---

[8] In fact, the Hearing Officer specifically noted that, although Plaintiff was accused of harassing
Dr. Calvi with repeated phone calls, the phone records suggested that the opposite was the case.
(Decision ¶ 36.)  He also described the "alleged harassment by [Plaintiff] against Calvi" as "a
two-way street."  (*Id.* ¶ 35.)

[9] Defendants state in their Local Rule 56.1 Response to these statements that the memorandum
and letter comprise inadmissible hearsay.  A hearsay objection does not suffice as a denial of a
statement of undisputed fact.  *See U.S. Info. Sys., Inc.*, 2006 WL 2136249, at *4 (holding that a
tactic where one party "dispute[s] the factual assertions in the [other party's] corresponding
paragraphs with objections alone" and fails to cite evidence "directly violates" Rule 56.1.).  In
any event, the statements in these documents are not being admitted for the truth stated therein,
but rather for the fact that Defendants received these descriptions of the incident.

(Pl.'s 56.1 Stmt. ¶¶ 428-30; Bellantoni Dec. Ex. 8.)  Dr. Franks-Randall testified during the

3020-a hearing that she believed that Dr. Calvi had used profanity and had lied to her when she

denied doing so, that Dr. Calvi was disturbing the students during the incident, and that Dr.

Calvi's conduct had a negative impact on Dr. Calvi's image in the community.  (Pl.'s 56.1 Stmt.

¶¶ 431, 432, 435.)

     As a result of the incident, Dr. Franks-Randall placed a disciplinary letter in Dr. Calvi's

file stating that Dr. Calvi's behavior was "unconscionable," "offensive," and displayed "conduct

unbecoming an administrator," and concluded: "While by far this is the worst display of your

inability to control your emotions, it isn't the first time and I'm concerned that it won't be the

last time."  (Defs. 56.1 Stmt. ¶ 124; Pl.'s 56.1 Stmt. ¶¶ 434, 436.)  Dr. Franks-Randall also

banned Dr. Calvi from attending the high school graduation that year.  (Defs. 56.1 Stmt. ¶ 125.)

     4)  *Dr. Calvi was the subject of complaints from District staff and school parents.*

     Defendants concede that the District received numerous complaints about Dr. Calvi's

conduct from both parents and staff.

     Staff had complained to Dr. Franks-Randall about Dr. Calvi's "bizarre behavior" on

school trips, and had complained about other aspects of Dr. Calvi's performance as Assistant

Principal, including problems with the reporting of grades and inconsistency with respect to

student discipline.  (Pl.'s 56.1 Stmt. ¶¶ 416-17, 453.)

     Parents complained about a variety of aspects of Dr. Calvi's conduct.  Parents

complained to Dr. Franks-Randall and members of the Board that Dr. Calvi dressed

inappropriately for work.[10]  (*Id.* ¶¶ 413, 415.)  Dr. Franks-Randall testified that parents wanted

---

[10] Defendants state that when Dr. Franks-Randall raised this issue with Dr. Calvi, it was
immediately remedied.  (Defs. 56.1 Resp. ¶¶ 413, 415.)

Dr. Calvi to be fired "because of her manner of dress, tone of voice, inconsistent disciplinary measures and her use of profanity on multiple occasions."  (*Id.* ¶ 441.)

Parents in the community took the further step of presenting to the Board a signed petition of "No Confidence" calling for Dr. Calvi's termination at the July 3, 2007 meeting of the Board.  (*Id.* ¶¶ 443-45.)  Parents threatened to have a local television news station report on the fact that they wanted Dr. Calvi fired.  (*Id.* ¶ 442.)  Among the parents' complaints were that Dr. Calvi said demeaning things to the students, including calling them "thugs," and that she had emotional outbursts and yelled at and talked down to the students.  (*Id.* ¶ 446.)

Dr. Franks-Randall and the Board also received a letter from the North Elmsford Civic Association ("NECA") expressing the community's displeasure with Dr. Calvi's "abusive language, emotional outbursts and poor handling of sensitive issues with parents."  (*Id.* ¶ 445.)  Members of NECA also discussed concerns about Dr. Calvi at NECA meetings that were attended by Board members.  (*Id.* ¶ 452.)

A parent of a student also complained to Dr. Franks-Randall that her daughter witnessed Dr. Calvi being inappropriately affectionate with her then-boyfriend, who was a fellow member of the Mahopac Board of Education.  (*Id.* ¶¶ 456, 459.)  A different parent reported that her daughter had witnessed Dr. Calvi banging on the door to the school weight room, yelling and using profanities, and arguing loudly with a man inside the weight room (who was, in fact, Plaintiff).  Defendants claim that Dr. Franks-Randall investigated both of these incidents and took all appropriate measures in response.  (Defs. 56.1 Resp. ¶¶ 451, 469.)

5) *Dr. Calvi yelled at, and used profanities with, the recruiter in charge of filling the position for High School principal.*

16

Plaintiff also pointed to an incident in the Spring of 2007, when the District was interviewing candidates to fill the role of Principal at the high school (where Dr. Calvi was Assistant Principal). The District employed a recruiting firm to undertake the process of filling the position. The recruiter, Dr. Vincent Beni, interviewed Dr. Calvi for the position in March 2007, but she was not offered the position. Dr. Beni later complained to Dr. Franks-Randall that when he informed Dr. Calvi over the phone that she would not be hired for the position, she yelled at him and used profanities. (Pl.'s 56.1 Stmt. ¶¶ 483-85.) Dr. Franks-Randall discussed this incident with the Board, but she never considered filing disciplinary charges against Dr. Calvi in connection with this incident. (*Id.* ¶¶ 488-89, 520.)

6) *Dr. Calvi was the subject of a sexual harassment complaint from a District employee.*

Mark Barone, a network specialist for the District, filed a report stating that on one occasion, Dr. Calvi put her arms around him, told him that she wanted to kiss him and tried to kiss him. (*Id.* ¶¶ 474.) He rebuffed her advances, telling her that he was married, but she allegedly persisted and asked him again to give her a "little kiss." (*Id.* ¶¶ 475-76.) Mr. Barone filed the report of this incident with Plaintiff in Plaintiff's capacity as District sexual harassment officer.

Defendants state that Mr. Barone did not report this incident at the time it occurred, but rather, filed the report only at Plaintiff's urging, two years after the fact, after Plaintiff's affair was made public. Defendants state that Plaintiff himself drafted the complaint for Mr. Barone's signature, and that when Mr. Barone met with Dr. Franks-Randall and counsel for the District, he specifically stated that he did not want the matter to go any further. (Defs. 56.1 Resp. ¶¶ 474, 477-78.)

7) *Dr. Calvi was arrested for assault on public school grounds.*

17

In February 2008, Dr. Calvi was arrested for assault in the third degree following an incident involving her ex-husband and ex-mother in law at Dr. Calvi's son's basketball game at a school in the Mahopac School District.  (Pl.'s 56.1 Stmt. ¶ 453.)  The incident, and Dr. Calvi's, arrest were made public in a newspaper article.  (*Id.* ¶ 455.)  After her arrest, Dr. Calvi resigned from the Mahopac School Board.  (*Id.* ¶ 457.)  The charges were ultimately adjourned in contemplation of dismissal.  (*Id.* ¶ 456.)

Dr. Franks-Randall testified at the 3020-a hearing that the arrest was the subject of talk among District staff and administrators, and that Dr. Calvi's conduct, arrest, and resignation from the Mahopac School Board were embarrassing for the District.  (*Id.* ¶¶ 458-60.)  Dr. Calvi was assigned to work from home from February 2008 through the end of that school year, due to community concern about the incident.  (Defs. 56.1 Stmt. ¶¶ 319, 320.)  Dr. Calvi also ultimately resigned her tenured position as Assistant Principal in connection with the incident, although the parties dispute the degree to which this decision was voluntary.  (Defs. 56.1 Stmt. ¶ 321; Pl.'s 56.1 Stmt. ¶¶ 542-46.)

## B.    Procedural History

Plaintiff filed the instant Complaint on March 6, 2008, after the 3020-a disciplinary charges were filed, but prior to the hearings and his termination.[11]  Defendants answered the Complaint on April 24, 2008.

On December 10, 2008, discovery in the case was stayed pending the completion of the 3020-a hearings.  After the issuance of the Hearing Officer's decision in the 3020-a hearing in November 2009, the parties engaged in discovery.

---

[11] At the time the Complaint was filed, the case was before Hon. William C. Conner.  The case was transferred first to Hon. Denny Chin, and subsequently to Hon. Paul A. Crotty.  The case was transferred to the undersigned on September 30, 2010.

On April 13, 2010, Defendants filed an amended answer to the complaint, adding two affirmative defenses.  On July 23, 2010, Defendants filed the instant motion for summary judgment on all claims.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  A "material" fact is one that might "affect the outcome of the suit under the governing law."  *Id.*  The moving party bears "the burden of demonstrating that no material fact exists."  *Miner v. Clinton County, New York*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

In resolving this inquiry, the Court must construe "the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in that party's favor."  *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 718-22 (2d Cir. 2002) (noting that on summary judgment, a court must "resolve all ambiguities and draw all factual inferences in favor of the non-movant" (citing *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001))).  In opposing the motion for summary judgment, the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), or on mere denials or unsupported alternative explanations of its conduct.  *See SEC v. Grotto*, No. 05 Civ. 5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006).  Rather, the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor.

*Anderson*, 477 U.S. at 256-57.  To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of the truth.  *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 248-49).

The Second Circuit has also "emphasized that trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue."  *Chertkova v. Connecticut General Life Ins. Co*., 92 F.3d 81, 87 (2d Cir. 1996).

## III.     THRESHOLD ISSUES

### A.     State Law and Title VII Claims Against Individual Defendants

Plaintiff initially brought state law claims under Section 296 of the New York State Executive Law, but in his Opposition brief, he states that he is withdrawing those claims because he did not file the requisite Notice of Claim in connection with the matter.  (Opp. at 1 n. 2).  Thus, the state law claims are DISMISSED.

Defendants argue that the Title VII claims against the individual defendants must be dismissed because Title VII does not provide for liability against individuals.  In that regard, Defendants are correct.  *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) ("[I]ndividuals are not subject to liability under Title VII."); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (same).  Further, Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument.  *See Robinson v. Am. Int'l Grp., Inc*., 08 Civ. 1724, 2009 WL 3154312, at *4 & n.65 (S.D.N.Y. Sept. 30, 2009) (collecting cases holding that where party fails to address arguments in opposition papers on

summary judgment motion, the claim is deemed abandoned).  Thus, summary judgment dismissing the claims against the individual Defendants is GRANTED.

### B.  Jurisdiction / Exhaustion of Administrative Remedies

Defendants first argue that Plaintiff's Title VII claims must be dismissed for lack of jurisdiction, because Plaintiff failed to exhaust his administrative remedies.  The Court finds that it has jurisdiction to hear Plaintiff's claims, but that summary judgment with respect to that claim is, nevertheless, GRANTED, because Plaintiff did not assert that claim before the EEOC. Plaintiff's retaliation claim, however, survives dismissal because it is reasonably related to the charge that he did file with the EEOC.

### 1.  Applicable Law

As an initial matter, Defendants are incorrect that a failure to exhaust administrative remedies deprives a district court of jurisdiction to hear the Title VII claim.  Although older decisions did discuss the exhaustion requirement as a jurisdictional issue, *see, e.g., Nweke v. Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 214-16 (S.D.N.Y. 1998), the Second Circuit has more recently clarified that "the failure to exhaust administrative remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement."  *Francis v. City of New York,* 235 F.3d 763, 768 (2d Cir. 2000) (internal quotation marks and citations omitted).  Thus, even though the Court has jurisdiction to hear Plaintiff's Title VII claim, in order to survive dismissal, Plaintiff must have "first pursue[d] available administrative remedies and file[d] a timely complaint with the EEOC."  *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).  *See also Legnani v. Alitalia Linee Aeree Italiane, S.P.A*, 274 F.3d 683, 686 (2d Cir. 2001) ("Exhaustion of administrative remedies through the EEOC is an essential element of the Title

VII and ADEA statutory schemes and, as such, a precondition to bringing such claims in federal court." (internal quotation marks omitted)).

A plaintiff may raise in a district court complaint "only those claims that either were included in or are 'reasonably related to' the allegations contained in [his] EEOC charge." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (quoting *Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir. 1993)). The Second Circuit has recognized three scenarios where a claim would be considered "reasonably related" to the allegations in an EEOC charge: "[1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Alfano v. Costello*, 294 F.3d 365, 381-82 (2d Cir. 2002) (quoting *Butts*, 990 F.2d at 1402-03).

The "reasonably expected scope" prong "is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Deravin*, 335 F.3d at 201 (quotation marks and citations omitted). The inquiry under this prong has been described as a "fact-intensive analysis," with a "focus . . . on the factual allegations made in the EEO[C] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008) (citation omitted). "The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Hous. Auth.,* 458 F.3d 67, 70 (2d Cir. 2006) (per curiam) (citations and quotation marks omitted). *See also Walsh v. Nat'l Westminster Bancorp., Inc.*, 921

F. Supp. 168, 172 (S.D.N.Y. 1995) (holding that "the relevant inquiry" is not the plaintiff's

"intent or her understanding of the effect of her complaint on a later lawsuit," but rather

"whether the EEOC could reasonably be expected to investigate the sexual harassment claims

based on the allegations contained in the charge").

Courts "have refused to consider allegations made for the first time in a complaint when

these new allegations make up the core of plaintiff's claim." *Okon v. Appia*, No. CV-06-6810,

2008 WL 2245431, at *9 (E.D.N.Y. May 29, 2008) (collecting cases). Courts have held that a

claim "based on a wholly different type of discrimination" than that asserted in the EEOC

charge—for example, a claim based on national origin discrimination where the EEOC charge

alleged only racial discrimination—will not be permitted. *Solomon-Lufti v. Roberson*, No. 97

Civ. 6024, 1999 WL 553733, at *4 (S.D.N.Y. July 29, 1999) (quoting *Peterson v. Ins. Co. of N.

Am.*, 884 F. Supp. 107, 109 (S.D.N.Y. 1995)). Generally, courts dismiss claims that are so

qualitatively different from the allegations contained in an EEOC charge that an investigation

would not likely encompass the new allegations. *See, e.g., Mathirampuzha*, 548 F.3d at 74-78

(affirming dismissal of hostile work environment claim where EEOC charge alleged only a

single act of harassment/aggression); *Nweke*, 25 F. Supp. 2d at 214-16 (dismissing claims for

discriminatory policies based on race, sex or disability, and disparate impact of that policy on

female and disabled persons where EEOC charge contained only allegations of discriminatory

discharge and denial of union representation).

### 2.   Application

Plaintiff's Complaint brings two claims under Title VII: discrimination based upon

gender, and retaliation for filing an EEOC charge. Plaintiff's EEOC charge, filed August 21,

2007, checked the box marked "Sex" in the section headed "Cause of Discrimination / Based

On."  (Stern Dec. Ex. U.)  That EEOC charge predated any disciplinary action by Defendants, and, thus, does not contain any mention of discriminatory discipline.

The substance of Plaintiff's EEOC charge is focused almost entirely on the allegedly harassing conduct of Dr. Calvi.  To the extent it mentions any Defendant at all, it does so only in the context of the District's failure to take remedial action regarding Dr. Calvi's behavior.  It does not allege any discriminatory disciplinary action by any Defendant.

Although the disciplinary action alleged in the Complaint stemmed from the same sexual affair that gave rise to Plaintiff's EEOC complaint, there is nothing to suggest that an EEOC investigation into the remedial action taken by Defendants with regard to Dr. Calvi's conduct would address disciplinary action later taken against Plaintiff.  *See Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25-26 (2d Cir. 1985) (holding that "[t]here would be no reason for the EEOC to investigate [a] failure to rehire in connection with the claim of alleged discriminatory discharge unless the former were asserted as part of that claim").  And although the category of protected class – sex – is the same in the EEOC charge and the Complaint, failure to remedy sexual harassment and discriminatory discipline are "entirely distinct theor[ies] of liability," predicated on totally different acts.  *Walsh*, 921 F. Supp. at 172.  *See Alfano*, 294 F.3d at 381-82 (affirming dismissal of complaint regarding discipline, when EEOC charge "made no allegation regarding unfounded disciplinary action").  "Judicial claims which serve to amplify, clarify or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate."  *McGuire v. U.S. Postal Serv.*, 749 F. Supp. 1275, 1287 (S.D.N.Y. 1990) (citation and internal quotation marks omitted).

The Second Circuit has made clear that the exhaustion of administrative remedies is "an essential element of Title VII's statutory scheme." *Butts,* 990 F.2d at 1401. Plaintiff could have filed an additional charge with the EEOC after it became apparent that he would be subject to disciplinary action. Instead, the month after the disciplinary charges were filed against him, Plaintiff filed the instant Complaint. Because he failed to exhaust his administrative remedies, his claim for gender discrimination must be dismissed.

Not all of Plaintiff's Title VII claim is dismissed, however. The Complaint alleges both discrimination and retaliation. A claim is "reasonably related" to an EEOC charge when it alleges retaliation for the filing of the EEOC charge. *Id.* at 1402. The instant Complaint does so allege. Thus, the preconditions for Plaintiff's retaliation claim have been met. *See Legnani*, 274 F.3d at 687 (reversing dismissal of retaliation claim because it was reasonably related to the initial discrimination charge filed with the EEOC); *Pierre v. New York State Dep't of Corr. Servs.*, No. 05 Civ. 275, 2009 WL 1583475, at *9 (S.D.N.Y. June 1, 2009) (dismissing discrimination claims that were not reasonably related to allegations in EEOC charge, but allowing claim of retaliation for filing of EEOC charge to survive).

### C. Collateral Estoppel

Defendants argue that Plaintiff's claims are barred by the doctrine of issue preclusion because of the Hearing Officer's decision in the Section 3020-a hearing. The Court agrees that 3020-a Hearings are entitled to be given preclusive effect, but holds that giving them that effect does not estop Plaintiff from asserting his claims.

### 1. Applicable Law

"Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give state-court judgments the same preclusive effect as they would receive in courts of the same state."

*Burkybile v. Bd. of Educ. of the Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310

(2d Cir. 2005). "New York courts give quasi-judicial administrative fact-finding preclusive

effect where there has been a full and fair opportunity to litigate." *Id.* (citing *Ryan v. New York*

*Tel. Co.,* 62 N.Y.2d 494, 467 N.E.2d 487 (N.Y. 1984)).

In *Burkybile*, the Second Circuit held that a Section 3020-a Hearing, such as the one in

this case, is an "administrative adjudication that must be given preclusive effect." *Id.* at 311-12.

The court, quoting the Supreme Court's decision in *University of Tennessee v. Elliott*, 478 U.S.

788, 799 (1986), held that "when a state agency acting in a judicial capacity resolves disputed

issues of fact properly before it which the parties have had an adequate opportunity to litigate,

federal courts must give the agency's factfinding the same preclusive effect to which it would be

entitled in the state's courts." *Burkybile*, 411 F.3d at 312.

### 2.    Application of Law to this Case

Under *Burkybile*, the 3020-a Hearing in this case is entitled to preclusive effect, and thus,

Plaintiff is estopped from challenging any of the factual findings made during that proceeding.

Those findings, however, do not bar Plaintiff's claims.  Collateral estoppel applies only if "the

issue in question was actually and necessarily decided in a prior proceeding." *Colon v.*

*Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995).  It is undisputed that the 3020-a hearing did not

directly address any of Plaintiff's claims of retaliation or discrimination.  Indeed, the Decision

does not at any point mention Plaintiff's EEOC filing.[12]  The Decision mentions that "the matter

of Calvi not being disciplined was raised by counsel" for Plaintiff, but that the Hearing Officer's

"jurisdiction is limited to the charges preferred against [Plaintiff] and not Calvi . . . ."  (Decision

---

[12] In fact, during the course of the proceedings, Plaintiff's counsel attempted to question Dr.
Franks-Randall about Plaintiff's filing of the EEOC charge, but counsel for the District objected.
The Hearing Officer sustained the objection and cut off the questioning on that issue.  (Stern
Dec. Ex. J, Transcript of 3020-a Hearing, Dec. 1, 2008, at 137:5-16.)

¶ 54, n. 25.)  Thus, because Plaintiff's retaliation claim was expressly not decided at the hearing, he is not estopped from pursuing that claim now.  *See Morey v. Somers Cent. School Dist.*, No. 06 Civ. 1877, 2007 WL 867203, *5 (S.D.N.Y. Mar. 21, 2007) (holding that where "the record of administrative hearing is devoid of any evidence that the issue of retaliation was actually litigated and necessarily decided," collateral estoppel did not bar the plaintiff's retaliation claims); *see also Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) (holding that an administrative finding concerning a plaintiff's termination "could have preclusive effect on her Title VII claim in federal court only if [she] had unsuccessfully sought to contest her discharge . . . leading to a judgment on the *same claim or issue*" (emphasis added)).

Contrary to Defendant's argument, a finding that Plaintiff was terminated for cause does not bar Plaintiff's Title VII claim.  Even if Plaintiff cannot dispute the factual findings of the Hearing Officer's decision, Plaintiff can still prevail if he shows that Defendants acted with an improper motive in bringing charges against Plaintiff.  *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("It is . . . settled that a plaintiff in a Title VII action need not *disprove* a defendant's proffered rationale for its adverse actions in order to prevail." (emphasis added) (citing *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) ("Title VII plaintiff can prevail by proving that an impermissible factor was a 'motivating factor,' without proving that the employer's proffered explanation was not some part of the employer's motivation."))).  Accordingly, the Court proceeds to the merits of Plaintiff's claim.

**IV.    RETALIATION CLAIM**

Retaliation claims under Title VII are analyzed using the three-step burden shifting framework first outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802-04 (1973).  *See Coffey v. Dobbs Int'l Servs., Inc.,* 170 F.3d 323, 326 (2d Cir. 1999)

(noting that *McDonnell Douglas* analysis applies in Title VII retaliation cases).  The plaintiff

must first establish a prima facie case, by presenting evidence sufficient to permit a rational trier

of fact to find

> [1] that []he engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action.

*Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (citation and quotation marks

omitted).  The Second Circuit has characterized the plaintiff's prima facie burden as "minimal"

and "*de minimis*." *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005) (quoting

*Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).  "In determining

whether this initial burden is satisfied in a Title VII retaliation claim, the Court's role in

evaluating a summary judgment request is to determine only whether proffered admissible

evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute*

*v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005) (citing *Donahue v. Windsor*

*Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987)).  "[A] plaintiff may not rely on

conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce

some tangible proof to demonstrate that [his] version of what occurred was not imaginary."

*Cobb v. Pozzi,* 363 F.3d 89, 108 (2d Cir. 2004) (internal citation omitted).

If the plaintiff satisfies his prima facie burden, a presumption of retaliation arises, and the

burden of production shifts to the defendant to proffer a "legitimate, non-retaliatory reason for

the adverse employment action."  *Jute*, 420 F.3d at 173.  The defendant's burden at this step has

been characterized as "light." *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir. 1998).

28

It is a burden of production, not persuasion, and thus does not involve a credibility assessment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).   "The employer need not *persuade* the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway*, 143 F.3d at 52 (citation omitted).

If the defendant proffers a legitimate, non-discriminatory reason for the adverse action, the presumption of retaliation drops out, and the burden shifts back to the plaintiff to show that "retaliation was a substantial reason for the adverse employment action." *Jute*, 420 F.3d at 173.

### A.      Plaintiff's Prima Facie Case

The Court finds that Plaintiff has successfully made out a prima facie case of retaliation.

### 1.      Protected Activity, Defendants' Knowledge of Same

As to the "protected activity" element of a Title VII retaliation claim, the plaintiff need only "have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." *Kessler*, 461 F.3d at 210 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)).   He need not prove the underlying discrimination allegations.

There is no dispute that Plaintiff engaged in protected activity and that Defendants were aware of the activity.   Plaintiff filed an EEOC charge of gender discrimination on August 21, 2007.   (Defs. 56.1 Stmt. ¶ 328.)   On the same day, Plaintiff's attorney sent a letter to Dr. Franks-Randall informing her that Plaintiff had filed the EEOC charge.   (*See* Ex. V.)

### 2.      Adverse Employment Action

Plaintiff has also shown that he was subject to an adverse employment action.

An "adverse employment action" for purposes of a retaliation claim is one that "a reasonable employee would have found . . . materially adverse, which in this context means it

29

well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67-69 (2006) (citation and quotation marks omitted). "Adverse employment actions in the context of a retaliation claim cover a broader range of conduct than in the discrimination context." *Gentile v. Potter*, 509 F. Supp. 2d 221, 238-39 (E.D.N.Y. 2007) (citing *Burlington N.*, 548 U.S. 53). Thus, unlike a plaintiff alleging discrimination, Plaintiff need not show that the purported adverse action is "one that affects the terms, privileges, duration, or conditions of employment." *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996). *See Burlington N.*, 548 U.S. at 64 (holding that "adverse employment action" in the retaliation context "is not limited to discriminatory actions that affect the terms and conditions of employment").

Disciplinary charges were issued against Plaintiff on February 6, 2008, a formal 3020-a hearing took place over the course of a year and a half, and thereafter, his employment with the District was terminated.[13] Defendants argue, in the context of Plaintiff's discrimination claim that "the mere initiation of disciplinary charges does not constitute an adverse employment action for the purposes of Title VII." (Defs.' Mem. of Law in Support of Motion for Summary Judgment (hereinafter "Defs. Mem."), at 13 (citing *Carter v. New York City Dep't of Corr.*, 7 F. App'x 99, 103 (2d Cir. 2001)).) But that standard does not apply in the retaliation context. To support his retaliation claim, Plaintiff need show only that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.,* 548 U.S. at 68 (citation and quotation marks omitted).

The Second Circuit has held that the filing of disciplinary charges against a New York school district employee, with the "threat of a Section 3020-a hearing" could have such a

---

[13] Defendant does not base his Title VII claim on his termination, but rather on the initiation of disciplinary action against him. (*See* Stern Dec., Ex. A, Complaint, ¶¶ 14-15.)

deterrent effect.  *Burkybile*, 411 F.3d at 313-14 (holding in the context of retaliation for exercising First Amendment Rights).  Not only does a Section 3020-a hearing permit suspension (with pay) and carry with it the threat of possible termination, but it also requires the employee to "incur the expense and inconvenience of extensive litigation."  *Id.* at 314.  The Second Circuit held that "[s]uch consequences are clearly deterrents for even a person of ordinary firmness."  *Id.*

The filing of disciplinary charges against Plaintiff resulted in his immediate suspension, over a year of litigation, and ultimately his termination.  Thus, the Court finds that Plaintiff has shown that he suffered adverse employment action.

### 3.   Causation

The Court also finds that Plaintiff has met his "minimal" burden to establish a causal connection between his protected activity and the adverse action.  *Woodman*, 411 F.3d at 76.  Plaintiff does not point to any direct evidence of retaliatory animus, but the indirect evidence is sufficient to meet his burden.

### a.  Applicable Law

Although proof of causal connection can be shown <u>directly,</u> "through evidence of retaliatory animus directed against a plaintiff by the defendant," it is well settled that causation can also be established <u>indirectly,</u> "by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct."  *DeCintio v. Westchester Cnty. Medical Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).

First, a plaintiff can show causation indirectly by showing a "close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions."  *Treglia*, 313 F.3d at 720.  The Second Circuit "has not drawn a bright line to define the outer

limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001).   However, courts have typically held that two to four months is the "outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation." *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 529 (S.D.N.Y. 2007) (quoting *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) and collecting cases).   The Second Circuit has also described the *prima facie* test as "demanding only that the protected activity preceded the adverse action," and some courts have found a sufficiently close temporal relationship where the adverse action occurred well over four months after the protected activity.  *Raniola*, 243 F.3d at 624.  *See id.* (holding that filing of EEOC charge in July 1995 and termination in September 1996 was sufficient to meet prima facie case); *Burkybile*, 411 F.3d at 314 (noting that an inference of retaliatory intent has been found in cases involving a gap of as long as eight months).

In order to show disparate treatment, a plaintiff must show that he was "similarly situated in all material respects" to those with whom he seeks to compare himself.  *Graham*, 230 F.3d at 39.  The determination of whether or not two employees are "similarly situated" for purposes of this test is ordinarily a question of fact for the jury, *Feingold v. New York,* 366 F.3d 138, 154 (2d Cir. 2004), though this rule is "not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

In *Graham*, the Second Circuit elaborated on what "all material respects" means in determining whether two employees are "similarly situated," holding that the concept

> varies somewhat from case to case and . . . must be judged based on (1) whether
> the plaintiff and those he maintains were similarly situated were subject to the

same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness.  In other words there should be an objectively identifiable basis for comparability.

230 F.3d at 40 (citations omitted).  *See also Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95-96 (2d Cir. 1999) ("In order for employees to be similarly situated for the purposes of establishing a plaintiff's prima facie case, they must have been subject to the same standards governing performance evaluation and discipline and have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or appropriate discipline for it." (internal quotation marks and citation omitted)).

The Second Circuit has also cautioned that "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham*, 230 F.3d at 40.  In other words, the other employee's situation need only be "sufficiently similar to plaintiff's to support at least a minimal inference that the difference [in treatment] may be attributable to [retaliation]." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir. 2001).

### b.  Application of Law to Facts

Plaintiff filed his EEOC charge on August 21, 2007 and disciplinary charges were filed February 6, 2008.  (Defs. 56.1 Stmt. ¶ 231.)  The disciplinary charges followed an independent investigation that was initiated in September 2007, shortly after Plaintiff filed the EEOC charge.  Although there is no dispute that the disciplinary charges stemmed from the same set of circumstances that gave rise to his EEOC charge (*i.e.*, Plaintiff's affair with Dr. Calvi), the temporal proximity – six months – might not be sufficient in itself to establish causation.  The Court need not resolve this question, however, because Plaintiff does not rely solely on temporal proximity to show causation.

Plaintiff ultimately bases his retaliation claim on a theory of disparate treatment of similarly situated employees.  Specifically, Plaintiff alleges that Dr. Calvi had committed acts of misconduct, of which Defendants were aware, that were no less serious than the acts for which Plaintiff was charged, and yet Dr. Calvi was not subject to the same disciplinary action.  In fact, although Dr. Calvi resigned her tenured job as Assistant Principal, she was immediately re-hired to a new position with the same salary and benefits (albeit with a three year contract, instead of tenure).

In addition, although both Plaintiff and Dr. Calvi filed EEOC complaints, Plaintiff appears to have been treated more harshly than Dr. Calvi afterwards.  Shortly after Plaintiff filed an EEOC complaint he became a target of an investigation that ultimately resulted in disciplinary charges and his termination.  Dr. Calvi filed an EEOC complaint, but *withdrew* it in connection with an employment agreement for a new job that granted her the same benefits as her previous job.[14]

The parties vigorously dispute whether Plaintiff and Dr. Calvi were "similarly situated." Plaintiff argues (1) that both he and Dr. Calvi were subject to the same procedures and standards for discipline and performance evaluation, given that they were both District administrators; and (2) that Dr. Calvi engaged in conduct similar to his, if not more egregious than his, without mitigating circumstances that could distinguish their conduct.

Plaintiff has made the requisite minimal showing that he and Dr. Calvi were "subject to the same workplace standards."  *Graham*, 230 F.3d at 40.  It is undisputed that Plaintiff was ranked higher than Dr. Calvi (even though the parties dispute the degree to which he could also

---

[14] The record is ambiguous as to the precise sequence of events concerning when, exactly, Dr. Calvi filed and withdrew her EEOC claim in comparison to when she negotiated her resignation and re-hiring. The record shows that Dr. Calvi filed her claim in the Spring of 2008, and that she withdrew the claim prior to her entering into the employment contract.

be characterized as her supervisor).  However, in a broad sense, both were senior administrators in the District, and it is fairly arguable that both engaged in serious misconduct by any standard of discipline for those positions.

Plaintiff has also made the requisite minimal showing that he and Dr. Calvi engaged in conduct "of comparable seriousness."  *Id.*  Several of the acts of misconduct with which Plaintiff was charged are identical to acts of misconduct by Dr. Calvi of which the District was aware. For example, Plaintiff was charged with lying to Dr. Franks-Randall about the nature of his relationship on two separate occasions, but Defendants acknowledge that Dr. Calvi "lied repeatedly" to Dr. Franks-Randall.  Plaintiff was charged with making repeated phone calls and inappropriate comments to Dr. Calvi, but Defendants were aware that Dr. Calvi had made repeated phone calls to Plaintiff and had repeatedly threatened him during the dissolution of their relationship.  Finally, Plaintiff was subject to 3020-a discipline for filing an incomplete account of his altercation with Dr. Calvi in the school hallway because he failed to describe the full scope of her inappropriate behavior in his report.  But Dr. Calvi was not subject to the same type of disciplinary charges, notwithstanding that she was the one who actually engaged in that inappropriate behavior.

Plaintiff also points out that Dr. Calvi was the subject of extensive, serious complaints from District staff, parents and community members, including a petition of "No Confidence" signed by school parents and submitted to the Board.  Dr. Calvi was also the subject of at least one sexual harassment complaint.  Finally, Dr. Calvi was arrested for assaulting her ex-husband and ex-mother in law on the property of a public school.  Yet, Dr. Calvi was not subject to 3020-a disciplinary charges, and was instead allowed to voluntarily resign her position, and was given a new position that paid the same salary and offered the same benefits as her prior job.

35

Although Defendants point to many mitigating factors to cast doubt on whether Plaintiff and Dr. Calvi are "similarly situated," under the *Graham* test, the Second Circuit has instructed courts to consider only the plaintiff's evidence in determining whether a Title VII retaliation claimant has met his initial prima facie burden.  *See Graham*, 230 F.3d at 42; *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 460 (S.D.N.Y. 2006).  Further, the circuit has characterized Plaintiff's burden at this stage as "minimal" and "*de minimis*."  *Woodman*, 411 F.3d at 76.  In light of this, the Court finds that Plaintiff has satisfied his minimal burden to show disparate treatment for purposes of a prima facie case. The burden thus shifts to Defendants to present a legitimate, non-discriminatory reason for the adverse employment action.

## B.   Defendants' Burden to Show a Legitimate, Non-Retaliatory Reason For the Adverse Employment Action

The Court finds that Defendants have readily satisfied their burden of showing a legitimate, non-retaliatory reason for the adverse employment action.  Defendants state that the District brought disciplinary charges against Plaintiff only after an independent investigation found that he had committed acts of serious misconduct.  Plaintiff refused to participate in the investigation, and so Defendants acted on the only information available to them in preferring disciplinary charges against Plaintiff.  Defendants also argue that because the initial investigation into Dr. Calvi's accusations preceded Plaintiff's filing of the EEOC charge it could not possibly be retaliatory.

The Hearing Officer's decision also supports Defendant's argument.  It is well settled that administrative charges decided against a plaintiff present a legitimate reason for discipline.  *See, e.g., Raniola*, 243 F.3d at 624-25 (explaining that "a prior administrative finding may supply a non-discriminatory reason for an employment discharge under the familiar *McDonnell Douglas* burden shifting framework" and holding that the plaintiff's administrative termination for cause

36

served as a legitimate, non-discriminatory reason).  Here, the Hearing Officer found that Plaintiff engaged in four instances of misconduct, the most serious of which was a breach of confidentiality of Board information during union negotiations.  The Hearing Officer ultimately determined that Plaintiff's misconduct "*per se* render[ed him] unfit to continue in his position." (Decision ¶ 62.)  The Hearing Officer concluded that Plaintiff's actions rose "to the level of misconduct for which termination is warranted," and that "the judgement [*sic*] of the District was correct in terms of the imposition of discipline."  (*Id.*)  Thus, Defendants have met their burden to show a legitimate, non-retaliatory reason for the adverse employment action taken against Plaintiff.

### C.      Plaintiff's Burden to Show Retaliatory Intent

Because Defendants have shown a legitimate, non-retaliatory reason for disciplining Plaintiff, the presumption of retaliatory intent "completely drops out of the picture."  *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (citation omitted).  The Court must "examin[e] the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against plaintiff." *Woodman*, 411 F.3d at 76 (citation and quotation marks omitted).

The Court finds that there are genuine issues of fact that preclude summary judgment on whether Plaintiff can show retaliatory intent.  Viewing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the Court finds that a reasonable jury could find (1) that Plaintiff was similarly situated to Dr. Calvi; (2) that they were subject to disparate treatment; and (3) the circumstances show that retaliation was a substantial motivating factor for Defendants' action.  Thus, summary judgment on this issue is DENIED.

### 1.      Applicable Law

The most common way for a plaintiff to prevail at this stage is to show that Defendants'

proffered reason was a pretext for a retaliatory motive, but a plaintiff alleging "that the employer

acted with mixed motives is not *required* to prove that the employer's stated reason was a

pretext." *Holcomb v. Iona Coll.*, 521 F.3d 130, 142 (2d Cir. 2008).  Indeed, "it is . . . settled that

a plaintiff in a title VII action need not disprove a defendant's proffered rationale for its adverse

actions in order to prevail." *Gordon*, 232 F.3d at 117.  Rather, a plaintiff is required to prove

only "that a retaliatory motive played a part in adverse actions toward him, whether or not it was

the sole cause." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir.

2011) (citing *Terry v. Ashcroft,* 336 F.3d 128, 140–41 (2d Cir. 2003) (quotation marks omitted)).

*See also Holcomb*, 521 F.3d at 142 ("[A] plaintiff alleging that an employment decision was

motivated both by legitimate and illegitimate reasons may establish that the 'impermissible

factor was a motivating factor, without proving that the employer's proffered explanation was

not some part of the employer's motivation.'" (quoting *Fields*, 115 F.3d 116 at 120)); *Back v.

Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 123 (2d Cir. 2004) ("[T]o defeat

summary judgment within the *McDonnell Douglas* framework the plaintiff is not required to

show that the employer's proffered reasons were false or played no role in the employment

decision, but only that they were not the only reasons and that the prohibited factor was at least

one of the 'motivating' factors." (citation omitted)).  Even where a plaintiff has been found

guilty in administrative disciplinary proceedings, if the defendant was "motivated by retaliatory

animus [in initiating the disciplinary proceedings], Title VII would be violated even though there

were objectively valid grounds for the proceeding and the resulting discharge." *DeCintio*, 821

F.2d 111 at 116, n.8.

Although the plaintiff need not show that the retaliatory motive was the sole cause of the adverse employment action, retaliation must be "at least a substantial or motivating factor." *Raniola*, 243 F.3d at 625 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

### 2.      Application of Law to Facts

Plaintiff argues that, even if the District ultimately had "objectively valid grounds" to discipline him, *DeCintio*, 821 F.2d at 116 n.8, retaliation was a substantial motivating factor in bringing the charges.  To support this claim, Plaintiff relies on a theory of disparate treatment, arguing that Dr. Calvi was not subject to the same discipline, despite engaging in comparable conduct.

Defendants argue that Plaintiff was not subject to disparate treatment for three principal reasons: (1) Plaintiff and Dr. Calvi were not "similarly situated" because he was her superior within the District hierarchy; (2) Plaintiff and Dr. Calvi were not "similarly situated" because Plaintiff's misconduct was more egregious than Dr. Calvi's alleged misconduct; and (3) any alleged misconduct by Dr. Calvi was investigated and handled appropriately.  Defendants also argue that the investigation of Plaintiff's misconduct predated his EEOC claim, which, Defendants argue, was only filed as a strategic gambit to set up a retaliation claim.

### a.  Same Workplace Standards

Defendants argue that Plaintiff cannot meet the first prong of the *Graham* test for "similarly situated" employees, because Plaintiff and Dr. Calvi held different positions, at different levels of authority in the District hierarchy, and thus were not "subject to the same workplace standards."  230 F.3d at 40.  In particular, Defendants argue that, as Deputy Superintendent, Plaintiff was the second highest ranking employee in the District, and was Dr.

Calvi's superior, whereas Dr. Calvi was only an Assistant Principal.  Thus, Defendants argue,

even if Plaintiff and Dr. Calvi engaged in identical behavior (for example, making repeated

phone calls to each other), it was reasonable to discipline him more severely because Plaintiff

was Dr. Calvi's superior.  (Defs. Mem. at 14.)

Plaintiff disputes Defendant's characterization.  While he concedes that he was Dr.

Calvi's superior, he contends that he had no direct supervision or control over Dr. Calvi, and had

no actual control over her pay raises or evaluations.  (Pl.'s 56.1 Stmt. ¶ 349.)  Pointing to the

District organizational chart, Plaintiff contends that that the Deputy Superintendent is ranked on

the same "level" as Assistant Superintendents, High School Principals and Elementary

Principals, and that the Assistant Principal position falls in the High School Principal's chain of

command, not that of the Deputy Superintendent.  (*Id.* ¶ 353; Stern Dec. Ex. M.)  He argues that

both he and Dr. Calvi were subject to the same disciplinary procedures and standards for school

administrators under Section 3020-a.

Much of this dispute turns on interpretation of the Parties' deposition testimony regarding

the structure of the District's hierarchy and the exact contours of Plaintiff's duties.  Although it is

not disputed that Plaintiff was ranked higher than Dr. Calvi, there are genuine issues of fact as to

the precise hierarchical relationship between them.  The factual question for the jury to resolve

is, ultimately, whether the District, as a matter of policy, held Plaintiff and Dr. Calvi to different

"workplace standards" of behavior and discipline.  *Graham*, 230 F.3d at 40.

Defendants point to decisions granting summary judgment to employers that turned on

the fact that the plaintiff and the party being compared to the plaintiff were at different levels of

authority.  However, many of those cases involve discrimination claims based on a failure to

promote, which, unlike a claim based on discrimination, requires a stronger showing of similarity

before jobs may be found to be comparable.  *Compare Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 410 (S.D.N.Y. 2006) (holding that, for failure-to-promote claim, plaintiff and comparing employee must "share a sufficient amount of significant employment characteristics," including "similarities in education, seniority, performance, and specific work duties") *and Roa v. Mineta*, 51 F. App'x 896, 899 (2d Cir. 2002) (holding that two employees in failure-to-promote claim are not similarly situated because "their duties and responsibilities were materially different") *with Graham*, 230 F.3d at 40 (holding that standard for discriminatory discipline case is (1) whether the employees "were subject to the same workplace standards" and (2) whether the employees' conduct "was of comparable seriousness").

Defendants also note that Plaintiff and Dr. Calvi reported to different supervisors.  This consideration is less important in the wake of the *Graham* decision, although some decisions have continued to treat it as a relevant inquiry.  *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) (collecting post-*Graham* cases from this circuit that considered whether employees reported to the same supervisor in determining whether they were similarly situated for purposes of retaliation claim).   Although this consideration may be relevant in some cases, it is not dispositive here, where, even though Plaintiff and Dr. Calvi reported directly to different supervisors, the same people – Dr. Franks-Randall and the Board – were ultimately responsible for disciplining both of them.  *Cf. id.* at 466 (granting summary judgment against plaintiff where "a different decisionmaker was responsible for investigating and determining how to discipline" the other employee).

Defendants' argument that two employees could be disciplined differently for the same conduct where one is the other's superior is well taken.  But Defendant has not submitted evidence showing that there is no genuine issue of material fact as to whether Plaintiff and Dr.

Calvi were, in fact, subject to different workplace standards.  A reasonable jury could find that, as tenured administrators, Plaintiff and Dr. Calvi were subject to the same standards of discipline and behavior.

### b.  Comparable Seriousness of Conduct

The Court holds that a reasonable jury could find that Plaintiff and Dr. Calvi engaged in conduct that was of "comparable seriousness." *Graham*, 230 F.3d at 40.

Defendants argue that Plaintiff's misconduct was more egregious than any alleged misconduct by Dr. Calvi.  In particular, Defendants point out that Plaintiff was "entrusted with strict confidences by the Board of Education, being privy to information discussed at secret executive session of the Board."  (Defs. Mem. at 14.)  According to Defendants, "Dr. Calvi did not do anything that approached the breach of the confidence of the Board as plaintiff had done." (*Id.* at 16.)  The Hearing Officer's decision to recommend termination was plainly driven by this particular act, which he stated was "indicative of an individual who has lost virtually any semblance of knowing what is correct behavior and what is not."  (Decision ¶ 40.)

The argument that the breach of confidentiality was more serious than any alleged misconduct by Dr. Calvi is a compelling one, but the charges against Plaintiff were not limited to this one act of misconduct.  Looking at the full range of alleged misconduct with which Plaintiff was charged, it is apparent that much of it was similar to the conduct in which Dr. Calvi engaged (and about which Defendants knew).  For example, Plaintiff was charged with lying to Dr. Franks-Randall, and harassment in connection with the break-up of the affair.  Dr. Franks-Randall conceded that she was fully aware that Dr. Calvi had engaged in the same conduct.[15]

---

[15] The most obvious misconduct that Plaintiff and Dr. Calvi engaged in equally was, of course, having sexual relations with one another in the school building.  However, as explained *supra*, the fact that Dr. Calvi had received immunity regarding this incident under a separate agreement

Further lending support to an inference of retaliatory motive is that several of the acts of misconduct relied upon by Defendants in bringing charges against Plaintiffs had previously been deemed by Defendants to be so unremarkable that they did not prevent the Board from giving Plaintiff a raise at the end of June 2007.  It was only later, after Plaintiff filed his EEOC claim, on August 21, 2007, that Defendants claimed that those acts of misconduct supported their seeking Plaintiff's termination.  Specifically, (1) Dr. Franks-Randall knew that Plaintiff had previously asked Dr. Calvi to perform a reading evaluation of his daughter at the time it happened in 2005; (2) Dr. Franks-Randall learned on June 18, 2007, when the affair was revealed, that Plaintiff had previously lied about the nature of his relationship with Dr. Calvi; (3) because Dr. Franks-Randall knew about Plaintiff's relationship with Dr. Calvi as of June 18, 2007, she knew as of that date that Plaintiff allegedly should have recused himself from certain meetings and investigations related to Dr. Calvi during the course of their affair; and (4) soon after the affair was revealed on June 18, Dr. Franks-Randall became aware that Plaintiff had filed an incomplete report of the June 15 Hallway Incident because they specifically discussed his desire to rewrite or amend the report with the District's counsel at a meeting held that week (Defs. 56.1 Stmt. ¶¶ 119-22.)  Although the most serious charges against Plaintiff were based upon information not known to Defendants until August 2007, the inclusion of the aforementioned charges could support a finding that Defendants were motivated to bring disciplinary charges in part by Plaintiff's filing of the EEOC charge.

Support for such a finding could also be found in the fact that Defendants charged Plaintiff with several acts of misconduct that were "*de minimis*" and inappropriate for discipline

---

makes it irrelevant for purposes of the disparate treatment analysis.  At the same time, the fact that the District readily agreed to grant Dr. Calvi immunity in order to build the case against Plaintiff could lend further support to the conclusion that Defendants acted with a retaliatory motive.

under Section 3020-a, according to the Hearing Officer.  For example, although the Hearing

Officer found that Plaintiff had taken a "sick" day on a day when he was not ill, he concluded

that there was no District policy that such misconduct could support an employee's termination.

(Decision ¶ 39.)  As to the reading evaluation of Plaintiff's daughter, the Hearing Officer noted

that it could be "looked upon as a friend doing a favor for a friend. . . .[O]ne might surmise that

in the field of education, as well as any professional field whether it be law or medicine,

professionals often do favors for other professionals."  (*Id.* ¶ 50.)  As to some of the charges

regarding Plaintiff's alleged treatment of Dr. Calvi in connection with the  relationship, the

Hearing Officer noted that "[h]ow couples break up or choose to end a relationship is a personal

choice; however, it is rarely, if ever the subject of disciplinary charges."  (*Id.* ¶ 13.)  And

regarding Plaintiff's alleged failure to investigate Dr. Calvi's sexual harassment complaint, the

Hearing Officer noted that "[i]f [Plaintiff] failed to complete his duty then it behooved the

District to take corrective action related to performance failure.  To make this Specification the

subject of a 3020(a) charge was not convincing."  (*Id.* ¶ 14.)

Ultimately, the Court concludes that it should be for a jury to determine whether Dr.

Calvi and Plaintiff engaged in comparably serious conduct.  A reasonable jury could find that

Plaintiff's misbehavior was no more serious than that of Dr. Calvi, that each deserved

comparable discipline, and that failure to treat them similarly was due to retaliation for Plaintiff

having filed  an EEOC complaint.  *See Graham*, 230 F.3d at 43 (holding that a jury could find

that one employee's violation for excessive absenteeism was comparable to another employee's

violation for alcohol use in light of the relevant workplace standards).

### c.  Disparate Treatment

Defendants argue that any alleged misconduct by Dr. Calvi was investigated and handled appropriately, thus the treatment of Plaintiff and Dr. Calvi was not disparate.  However, genuine issues of material fact preclude summary judgment on this issue.

Defendants contend that Dr. Franks-Randall investigated each alleged act of misconduct by Dr. Calvi and took all appropriate steps.  For example, Plaintiff argues that Dr. Calvi was the subject of complaints because her wardrobe was inappropriately revealing, but Defendants contend that after Dr. Franks-Randall spoke to Dr. Calvi about this issue, it was no longer a problem.  After the hallway altercation with Plaintiff, Dr. Franks-Randall placed a disciplinary letter in Dr. Calvi's file, and Dr. Calvi was banned from attending graduation.  Dr. Franks-Randall followed up with Mark Barone regarding his sexual harassment complaint against Dr. Calvi, but Mr. Barone himself declined to pursue the matter further.  And after Dr. Calvi's arrest, she was assigned to work from home for the duration of the school year and ultimately lost her tenured job as Assistant Principal.

The parties dispute the circumstances surrounding Dr. Calvi's resignation as Assistant Principal.  Defendants contend that the Superintendent decided to reassign Dr. Calvi to another position, presumably as a result of the various complaints against her.  However, Defendants concede that it was Dr. Calvi's decision to resign from her position as Assistant Principal. (Pl.'s 56.1 Stmt. ¶ 543.)  Dr. Calvi testified at her deposition that she resigned because the new position had different responsibilities that appealed to her.  (*Id.* ¶ 544.)  And it is undisputed that Dr. Calvi received a three-year contract with the same benefits and salary that she received in her position as Assistant Principal.  (*Id.* ¶ 546.)

The timing of this new employment agreement is particularly troubling to the Court.  The record shows that Dr. Calvi herself had filed an EEOC complaint in Spring 2008, but that she

45

withdrew that complaint in conjunction with the new employment agreement.  (Bellantoni Dec. Ex. 2 at 56-57; Decision ¶ 57.)  A reasonable jury viewing these circumstances could conclude that Dr. Calvi engaged in misconduct, but upon withdrawing her EEOC complaint, got away with a mere "slap on the wrist."  Meanwhile, Plaintiff filed an EEOC complaint, refused to resign his position or withdraw the complaint, and was met with disciplinary charges that ultimately resulted in his termination.  A reasonable jury could further conclude that, had Plaintiff withdrawn his EEOC complaint, he may have received the same treatment as Dr. Calvi.

The timing of Plaintiff's filing of the EEOC charge immediately after hearing about the investigation into his conduct potentially weakens his case, and a jury may be persuaded that that alone defeats any inference of retaliatory motive.  But given the facts that Dr. Calvi and Plaintiff both committed acts of misconduct and both filed EEOC complaints, but were then treated so differently when one maintained the complaint while the other withdrew it, a reasonable jury could conclude that Defendants acted with a retaliatory motive.

Accordingly, summary judgment on this issue is DENIED.

## V.    CONCLUSION

For the reasons stated above, the Court (1) GRANTS the motion for summary judgment dismissing the claims against the individual defendants, Defendants Franks-Randall, Funny-Crosby, Evans and Lawrence; (2) GRANTS the motion for summary judgment dismissing Plaintiff's claims under New York state law; (3) GRANTS the motion for summary judgment dismissing Plaintiff's Title VII discrimination claim for failure to exhaust his administrative remedies as to that claim; and (4) DENIES the motion for summary judgment dismissing Plaintiff's Title VII retaliation claim.

The parties shall, by August 15, 2011, submit to the Court a joint letter outlining any steps that need to be taken before the case is Ready for Trial.  Absent the need for such steps, the case will be deemed Ready for Trial October 17, 2011.  The parties must file a joint pretrial order by September 26, 2011.  Counsel are directed to comply with this Court's Individual Rules.  The parties shall advise the Court by September 26, 2011 whether they consent to trial of this case before a Magistrate Judge.

SO ORDERED.

Dated: New York, New York
       July 27, 2011

Kimba M. Wood
United States District Judge